**Affirmed and Majority and Concurring Opinions filed May 21, 2024**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00699-CR

### TRISTAN KEIR EDWARDS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 239th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 85794-CR**

## MAJORITY OPINION

Appellant Tristan Keir Edwards appeals his conviction for capital murder. *See* Tex. Penal Code Ann. § 19.023(a)(8). We affirm.

### BACKGROUND

Appellant and Shekinah Huffin began a relationship in the spring of 2017 and moved in together two weeks later. Shekinah had a 10-year old daughter living with them. Appellant and Shekinah had a son, the complainant, on August

25, 2018. Shekinah was not working outside of the home at the time. Appellant eventually lost his job and the four of them were going to be evicted from their two-bedroom apartment as a result. With the eviction approaching, Shekinah made arrangements to move in with her parents along with her two children. Appellant, on the other hand, would live with his mother. Shekinah described their situation as stressful.

On September 18, 2018, appellant and Shekinah were smoking marijuana throughout the day. That evening appellant and the complainant went to the bedroom to take a nap. They awoke from the nap about ten in the evening and Shekinah and appellant smoked more marijuana. Shekinah then asked appellant to hand her the complainant so she could feed him. According to Shekinah appellant began making strange statements, things that did not make sense. Shekinah testified that the strange statements included they could run away, drive to California to kill Jessica, appellant's former girlfriend and the mother of his older son. Appellant also told Shekinah to call her father so he could kill appellant.

At this point, with appellant acting strangely, Shekinah asked appellant for his cellular phone so she could call appellant's mother to intervene to calm appellant down. Shekinah tried to call appellant's mother and appellant took his phone back before she could make the call. Shekinah asked appellant to give the phone back to her. As appellant handed the phone to Shekinah, he grabbed the complainant from her and ran into the bathroom. Shekinah tried to call 9-1-1, but when she heard the water running in the bathroom, she entered the bathroom where she saw appellant holding the complainant's head under the running faucet. Shekinah moved into the tub pleading with appellant to give the complainant to her, but she was unsuccessful. Shekinah then began fighting with appellant in an effort to take the complainant from him. Appellant pushed Shekinah out of the tub

2

and he then smashed the complainant's head into the tub. According to Shekinah, appellant continued making strange statements while he smashed the complainant's head into the bottom of the tub. Shekinah screamed and ran out of the apartment in an effort to get away from appellant. Shekinah saw a stranger in the outside hallway. Shekinah told him that her baby had been killed and asked to use his phone to call 9-1-1. Shekinah got his phone and called 9-1-1.

Shekinah saw appellant come out of their apartment. Shekinah then went to another apartment where she slid down against the apartment's door. Raven Crawford heard frantic and consistent knocking on her apartment's entry door. Crawford opened the door and found Shekinah on the floor screaming.[1] Shekinah told Crawford and her roommate that her boyfriend was trying to kill her baby. They pulled a still screaming Shekinah into their apartment and the roommate closed the door with Crawford, a prison guard, remaining in the hallway. Crawford saw a calm appellant, whom she did not know, approaching her down the hallway. As appellant got closer, Crawford heard him saying random things such as "we got to get this money." Crawford told appellant to move away but he instead opened the apartment door. Crawford then grabbed appellant by his shirt and struck him, knocking him to the hallway floor. Appellant said "all right," and "I'm just playing." At this point, Shekinah said that she had another child in the apartment so Crawford let appellant go in an effort to get to the apartment and get the other child. Appellant instead ran past her into the apartment and locked the door.

Shekinah also testified about an incident several months before when she and appellant visited a waterpark. According to Shekinah, they smoked marijuana

---

[1] Crawford testified during appellant's trial that she did not know Shekinah's name at the time, but learned it later.

at the waterpark and appellant consumed an unknown pill. When they returned to their apartment, appellant grabbed Shekinah, shook her, and accused her of maintaining multiple social media accounts. Appellant then ran out of their apartment and Shekinah called 9-1-1. The responding police found appellant in the tub of another apartment. The police took appellant to a local hospital.

Numerous officers from the Pearland Police Department responded to Shekinah's September 9-1-1 call. The officers forced their way into the locked apartment using a sledgehammer and found a deceased child face-down on the kitchen floor next to a pool of blood, tissue, and brain matter. The officers located Shekinah's ten-year old daughter, removed her from the apartment, and reunited her with her mother. After breaching two more locked doors, the police officers found appellant hiding in the bathtub, laying in about two inches of water. Appellant gave the police officers the "middle finger" with both hands as they entered the bathroom. Appellant refused to get out of the bathtub so the officers physically removed him from the bathtub, handcuffed him, and then carried him out of the apartment, and eventually placed him in the back of a patrol car. While all of this was happening, appellant told the officers that he "smashed his son's head into the pavement," asked them to shoot him, and stated that "he was either going to get life in prison or the death penalty." Appellant was transported to the police station jail where his clothing was removed, he was placed in a restraint chair, and a spit mask placed over his head.

Shortly after 3:00 a.m. on September 19, 2018, Pearland Police Lieutenant Cecil Arnold interviewed appellant at the police station. Arnold was trained and certified as a mental health peace officer by the State of Texas. The interview took place after appellant was removed from the restraint chair. Arnold gave appellant a jail coverall, blanket, food, and water, before beginning the interview. In the

4

short time that had passed since the complainant was killed, appellant had calmed down and remained calm throughout the interview. During the interview, appellant admitted that he and Shekinah had smoked marijuana throughout the day and the marijuana was really strong. Early during the interview appellant shifted the blame away from himself, claiming that he dropped the complainant on the floor, and did not intend to hurt his infant son. Appellant also said that the incident occurred during an argument with Shekinah over his cellular phone. According to appellant, Shekinah would not give his phone back and she tried to beat him. Appellant told Arnold the fight occurred in the master bedroom and bathroom, and that Shekinah tried to "slam his head." Appellant claimed that he never got control over the complainant. Appellant stated that Shekinah dropped the complainant in the kitchen as she ran out of the apartment. When Arnold told appellant it appeared the complainant had been harmed in the bathroom, appellant responded that Shekinah had put the complainant under the water in the bathtub and had then dropped him on the bathtub and the floor during the fight. A few minutes later, appellant told Arnold that he and Shekinah both hurt the complainant. Later during the interview, appellant told Arnold that Shekinah threw the complainant down and was the one holding the complainant under the water.

Appellant contradicted himself throughout his interview with Arnold by changing his description of what happened from the beginning of the interview to the end of the interview. Despite his changing story, the video of the interview demonstrates that appellant understood Arnold's questions and responded in an appropriate manner to Arnold's questions. Appellant denied having any psychiatric or mental health diagnoses nor being prescribed any medications for mental illness. Additionally, nothing occurred during the interview that led Arnold to believe that appellant was impaired or having a mental health crisis. Arnold

5

ended the interview when appellant invoked his right to counsel.

Later that same morning, at approximately 10:30 a.m., appellant told a jailer he wanted to speak with an investigator. At that time, appellant was detained in a regular cell normally used by inmates awaiting transfer to the Brazoria County Jail, not a padded cell for inmates in crisis. Sergeant James McGuire and Detective John DeSpain, both with the Pearland Police Department, responded to appellant's interview request. Appellant told the investigators that Shekinah stabbed him in the neck with a hair pick during the fight while she held the complainant. Appellant claimed the incident began when Shekinah, holding the complainant, would not hand over his cellular phone. Appellant claimed the argument over the cellular phone became physical. When the investigators asked appellant how the complainant was hurt, he responded that Shekinah dropped the complainant while trying to get away from him. Once again, appellant was calm throughout the interview and he did not tell the investigators that, at the time of the incident, he was (1) under any mental distress; (2) experiencing any kind of delusions; or (3) hearing voices.

An autopsy was conducted on the complainant. The autopsy established that the complainant sustained blunt head and neck trauma that left him with a deformed skull, much of which was in pieces. A portion of the complainant's brain had been knocked out of his skull, was spread out on the kitchen floor, and was recovered by investigators at the scene. The medical examiner also observed blunt torso trauma, two rib fractures, and a large laceration of the complainant's liver. The complainant's vertebral column was also broken in two places. According to the medical examiner who conducted the autopsy, none of the complainant's injuries were consistent with him being dropped accidentally, even on a hard surface. The complainant's injuries all required significant force to

inflict—such as slamming the child head-first into a hard object.

Because appellant's case involved a child fatality and another minor lived in the same household, Ronzina Adauto, a child fatality investigator with the Department of Family and Protective Services ("DFPS"), was assigned to investigate the circumstances of the complainant's death. As part of her investigation Adauto interviewed appellant after he had been transferred to the Brazoria County Jail. Adauto was not allowed to use any recording devices during the interview. Adauto began the interview by asking appellant about his background and family history. According to Adauto, appellant responded appropriately to these questions and did not act in a way that gave her any concerns about his responses. During the interview, appellant denied that he had ever had a psychiatric diagnosis, or that he was taking any medications for mental illness. Appellant admitted that he smoked marijuana "two to three times a week five times - - - five to six times a day." Appellant also admitted that he had previously used LSD.

Appellant told Adauto the incident that resulted in the complainant's death began with an argument over a cellular phone. The argument escalated to a physical altercation that began in the bedroom and moved into the bathroom where appellant tried to drown the complainant under running water. Appellant also told Adauto that he threw the complainant onto the floor when he followed Shekinah out of the bathroom and then out of the apartment. Appellant admitted that he slammed the complainant on the floor two times until brain matter came out of the child's head. Appellant told Adauto that he knew the complainant was dead when he stopped crying. When Adauto asked appellant why he did this, appellant responded that he felt like he was losing his family and that his other children had also left with their mothers. Appellant admitted that he lied when he told DeSpain

7

and McGuire that Shekinah stabbed him in the neck with a hair pick. Appellant told Adauto that he had inflicted the injury on himself after the offense.

Eventually, appellant's attorneys asserted the affirmative defense that appellant was not guilty by reason of insanity. Appellant's attorneys also filed two pre-trial motions to suppress evidence. In the first motion, appellant sought to exclude the statements obtained during appellant's interviews with Pearland Police investigators, as well as any DNA and cellular phone evidence obtained as a result of those interviews. According to the first motion, appellant was incapable of understanding the meaning and effect of waiving his *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). In the second motion, appellant sought to exclude DFPS investigator Adauto's testimony about her interview of appellant in the Brazoria County Jail. Appellant argued that Adauto was working in tandem with the Pearland Police Department and his statement should be excluded because Adauto did not use the required procedural safeguards to secure the privilege against self-incrimination. *See id.* Adauto testified during the motion to suppress hearing and denied that she was working in tandem with law enforcement when she interviewed appellant. She instead testified that the purpose of her investigation was "establish the details of the event for the safety of the surviving siblings." The trial court denied both motions.

Appellant's attorneys hired Michael Fuller, M.D., a psychiatrist, to evaluate appellant for both his competency to stand trial and for purposes of appellant's insanity defense. Fuller testified that he initially found appellant competent to stand trial early in 2022. Fuller stated that appellant had some trouble recalling the specific events surrounding the complainant's death over the ten times he visited with appellant in jail. According to Fuller, appellant treated him with some suspicion believing Fuller was part of a "judicial conspiracy" against appellant.

8

According to Fuller, it was not until more details were provided by two other sanity evaluations performed by two psychologists, Timothy Proctor, Ph.D. and Anna Buckingham, PsyD., that Fuller concluded appellant was insane at the time of the offense. Fuller explained that it was a "cluster of information" describing appellant's symptoms and "psychotic episodes" before the offense that had a bearing on appellant's insanity defense. As a result of these new details, Fuller testified that his opinion on appellant's insanity at the moment he killed his son changed from "ambivalent" in early 2022, to "positive" by August of the same year.

Fuller's first report, completed in January 2022, diagnosed appellant with "Unspecified Psychotic Disorder and Marijuana Use Disorder." According to Fuller, whenever he visited appellant in jail, appellant "would stand rigidly, as if a statue, in his isolation cell naked, staring at me with a wild look in his eyes. He wouldn't move. He wouldn't interact. This was months after the event, and [appellant] would just stand there naked staring at me." Fuller testified that after he had completed ten brief visits with appellant, he had gathered enough information to write his report finding appellant insane. Fuller also testified that he had one productive visit with appellant but the others "were extremely brief due to his unwillingness to cooperate with [Fuller]."

Fuller was also made aware of other incidents occurring in the jail involving appellant, including one on September 23, 2018, in which appellant told his jailers repeatedly, "I need your forgiveness for killing my son." In another incident two weeks after the first, appellant told jail staff that he felt like killing himself. According to Fuller, appellant later denied being suicidal. In addition, Fuller testified appellant refused to see any mental health providers or other doctors working at the jail. As a result of his failure to see any of the doctors, he did not

receive any treatment or medication for his condition.

Fuller testified that he had diagnosed appellant with schizophrenia. Fuller admitted that it was difficult to reach a conclusion on appellant's sanity; however, he believed appellant was "actively psychotic" at the time of the offense. Fuller continued that appellant was "so overwhelmed and fearful" that he did not appreciate the fact he was committing a crime—even though, appellant later expressed regret for his actions.

Fuller admitted that nothing in the evidence specifically demonstrates that appellant did not know his conduct was wrong. Despite this, Fuller opined that the videos from the officers' body cameras showed appellant to be fearful for his life and convinced that family members were conspiring to kill him. Fuller also testified that it was questionable whether appellant understood the *Miranda* warnings given to him before his interviews with police investigators. Fuller's opinion formed the basis of appellant's motion to suppress appellant's interviews with investigators.

Another psychologist expert, Timothy Proctor, Ph.D., met appellant once in preparing his opinions. When Proctor asked appellant during this meeting if he had any independent memory of the offense, appellant replied, "I'm guilty." Nevertheless, Proctor testified that he believed appellant was coming out of a psychotic state while in the bathtub of the apartment before the officers placed him into custody. Proctor believed appellant suffers from a psychotic disorder— possibly schizophrenia. Accordingly, Proctor opined that appellant did not understand, at the exact moment of the offense, that killing the complainant was wrong.

A third psychologist expert, Anna Buckingham, PsyD., met with appellant for a total of nine hours over four sessions. In his initial interview with

Buckingham, appellant characterized his actions at the time of the offense as an "overreaction." Appellant also characterized his behavior as "snapping and just losing it." Buckingham ultimately concluded that appellant was suffering from a severe mental illness at the time of the offense, which resulted in "grossly impaired behavior." Buckingham also opined the onset of his psychosis was substance induced. Buckingham's finding was based, in part, on appellant's history of "using substances, both prescribed narcotics as well as illicit substances, [specifically, daily marijuana use] leading up to the incident."

As to whether appellant understood the wrongfulness of his actions at the time of the offense, Buckingham testified that he did. Although Buckingham believed appellant was suffering from a cannabis-induced psychotic episode at the time of the offense, she still concluded appellant knew that smashing the complainant's head was wrong. Buckingham based her conclusion on several facts, including appellant trying to hurt himself shortly after the incident by stabbing himself in the neck with a sharp comb and then hiding behind three locked doors to wait for the police to arrive. Buckingham disagreed with a schizophrenia diagnosis because schizophrenia requires continuous symptoms, and after the passage of three years, she found no medical records or other evidence indicating that schizophrenia was an ongoing symptomatic problem for appellant.

Following Buckingham's testimony, Fuller was called back to testify that he strongly disagreed with Buckingham's conclusion that appellant was under the influence of marijuana-induced psychosis. Fuller testified that the condition is "relatively rare" and that a large percentage of people with schizophrenia and psychotic disorders use marijuana, often to "escape the misery of their condition." Fuller explained that "[i]n the course of my 40 years in healthcare, I don't believe I've ever seen a case like this where marijuana was the culprit." Fuller also did not

11

believe appellant "had anything but a chaotic paranoid idea of what was happening" at the time of the offense.

On the morning of the fourth day of trial testimony, appellant's counsel filed a Motion Suggesting Incompetency and Request for Court Ordered Independent Examination by a Forensic Psychiatrist. Appellant's counsel filed the motion after Fuller, their psychiatrist expert witness, met with appellant in preparation for Fuller's trial testimony and then told appellant's attorneys that he believed appellant was not competent to continue with the trial. While appellant's trial counsel asked the trial court to adjourn the trial and order the psychiatric examination immediately, the trial court instead decided to hold the informal competency hearing after the jury's verdict but before imposing appellant's sentence as permitted by Article 46B.005(d) of the Code of Criminal Procedure.

At the close of the evidence, appellant asked for the lesser included offense of first-degree felony injury to a child be submitted in the jury charge, which the trial court denied. The trial court did instruct the jury that "voluntary intoxication does not constitute a defense to the commission of a crime." The case was then submitted to the jury, which found appellant guilty as charged. After the jury rendered its verdict, the trial court conducted the informal competency hearing and then denied appellant a full competency trial. The trial court then sentenced appellant to the mandatory sentence of life in prison without the possibility of parole. *See* Tex. Penal Code Ann. § 12.31(a)(2). This appeal followed.

### ANALYSIS

Appellant challenges his conviction in six issues. We address them in order.

## I.     Sufficient evidence supports the jury's rejection of appellant's insanity affirmative defense.

In his first issue on appeal, appellant contends the evidence supporting the

jury's implicit rejection of his insanity affirmative defense was legally insufficient.[2] *See* Tex. Penal Code Ann. §§ 2.04; 8.01(a).

## A.    Standard of review and applicable law

In Texas, a defendant is excused from criminal responsibility if he proves, by a preponderance of the evidence, the affirmative defense of insanity. *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). The test is whether, at the time of the conduct charged, the defendant, as a result of a severe mental disease or defect, did not know that his conduct was "wrong." *Id.* Under Texas law, "wrong" in this context means "illegal." *Id.* (citing Tex. Penal Code Ann. § 8.01(a) ("It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."). "Thus, the question for deciding insanity is this: Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified?" *Id.*

The defendant has the burden to establish an affirmative defense by a preponderance of the evidence. *See* Tex. Penal Code Ann. § 2.04; *Matlock v. State*, 392 S.W.3d 662, 666 n.5 (Tex. Crim. App. 2013). A defendant bears both the burden of proof and the burden of persuasion on the insanity affirmative defense. *Meraz*, 785 S.W2d at 150. When an appellant contends the fact finder had insufficient evidence to support its rejection of an affirmative defense, we

---

[2] Appellant has challenged only the legal sufficiency of the evidence supporting the jury's implicit rejection of his insanity affirmative defense. He has not challenged, and we therefore do not address, the sufficiency of the evidence supporting his capital murder conviction. *See Meraz v. State*, 785 S.W.2d 146, 153 (Tex. Crim. App. 1990) ("It is apparent therefore that a review of the facts relative to proof of an affirmative defense does not inexorably lead to a review of facts relative to proof of the elements of the offense. Although a defendant certainly is not foreclosed from requesting both reviews, the former does not incorporate the latter.").

apply the civil standards of review. *Matlock*, 392 S.W.3d at 669–71. Therefore, when a defendant asserts the evidence was legally insufficient, appellate courts first review the record for a "scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not." *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) (citing *Matlock*, 392 S.W.3d at 669–71). If the court finds not even a scintilla of evidence supports the fact finder's rejection of the affirmative defense, it next considers whether the affirmative defense was established as a matter of law. *Matlock*, 392 S.W.3d at 669. If the appellate record "reveals evidence supporting the defendant's position" but also shows that the "evidence was subject to a credibility assessment and was evidence that a reasonable jury was entitled to disbelieve," the appellate court may "not consider that evidence in [its] matter-of-law assessment." *Id.* at 670. A fact finder's rejection of "a defendant's affirmative defense should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and 'no reasonable [fact finder] was free to think otherwise.'" *Butcher*, 454 S.W.3d at 20 (quoting *Matlock*, 392 S.W.3d at 670).

The affirmative defense of insanity is a legal issue, not a medical one, and the jury is not restricted to medical science theories of causation." *Graham v. State*, 566 S.W.2d 941, 952–53 (Tex. Crim. App. 1978). Expert testimony, even if uncontradicted, does not establish insanity as a matter of law. *Id.* at 951. Indeed, when resolving an insanity contention, the fact finder may accept lay testimony over expert testimony. *Id.* A fact finder may, in addition to considering expert testimony, weigh other factors in assessing the issue of insanity. *Id.* at 951–53. Specifically, a fact finder may consider the person's demeanor before and after the offense, any attempts to evade police or to conceal incriminating evidence, a

14

person's expressions of regret or fear of the consequences of his or her actions, and possible motives for the offense. *Id.*

The insanity defense is not available when the defendant was voluntarily intoxicated or temporarily insane due to intoxication. Tex. Penal Code Ann. § 8.04(a); *Lopez v. State*, 544 S.W.3d 499, 503 (Tex. App.—Houston [14th Dist.] 2018, no pet.). "Intoxication" in section 8.04(a) refers to the "disturbance of mental or physical capacity resulting from the introduction of any substance into the body." *Id.* at § 8.04(d). Temporary insanity caused by voluntary intoxication is considered a defensive issue and entitles a defendant to a mitigation instruction during the punishment phase of a trial. *Lopez*, 544 S.W.3d at 503. It is not available to obtain a not-guilty verdict. *See McBurnett v. State*, 629 S.W.3d 660, 664 (Tex. App.—Fort Worth 2021, pet. ref'd) (stating that voluntary intoxication "is not a defense to the commission of a crime").

**B.      Legally sufficient evidence supports the jury's implicit rejection of appellant's insanity defense.**

In his first issue, appellant summarizes the testimony of the three expert witnesses, Fuller, Proctor, and Buckingham. He then argues that two of the experts, Fuller and Proctor, opined that appellant was legally insane at the time of the offense, while only a single expert, Buckingham, concluded appellant was sane at the time of the offense. Appellant asserts that no rational trier of fact could have "found the essential elements of capital murder beyond a reasonable doubt because appellant has shown by a preponderance of the evidence that appellant was insane at the time of the offense."

Appellant misconstrues the standard of review. The fact that the number of experts who opined appellant was insane at the time of the offense outnumbers the number of experts opining that appellant was sane does not mandate the conclusion

15

that the evidence supporting appellant's conviction was legally insufficient. Instead, the jury, as the trier of fact, could have determined that Buckingham's opinion was more credible than either Fuller and Proctor's opinions because of the amount of time she spent with appellant in preparing her opinion. In addition, Buckingham testified that, at the time of the offense, appellant was suffering from a severe mental illness caused by his use of marijuana. Based on Buckingham's opinion, and Shekinah's testimony detailing their marijuana use throughout the day the complainant was killed, the jury could have reasonably concluded that appellant was voluntarily intoxicated at the time of the offense and the insanity defense did not apply to excuse his conduct. *See* Tex. Penal Code Ann. § 8.04(a); *McBurnett*, 629 S.W.3d at 664 (stating that voluntary intoxication "is not a defense to the commission of a crime"). In addition, the jury could have accepted Buckingham's opinion testimony that while appellant was suffering from a marijuana-induced psychotic state at the time of the offense, he still understood that his conduct in smashing the complainant's head was wrong as demonstrated by his actions while awaiting the arrival of the police and after he was taken into custody by the police. We conclude the evidence is legally sufficient to support the jury's implicit rejection of appellant's insanity defense. *Butcher*, 454 S.W.3d at 20. We overrule appellant's first issue.

## II. The trial court did not abuse its discretion when it denied appellant's motion to suppress with respect to appellant's statements to the Pearland Police.

In his second issue, appellant asserts that he "was suffering from a mental illness at the time of the killing and during the interviews," "was not competent," and "was incapable of understanding the meaning and effect of waiving his *Miranda* warnings." As a result, appellant argues the trial court abused its discretion when it denied his motion to suppress both statements that he gave to

Pearland Police investigators.

When reviewing a trial court's ruling on a motion to suppress statements made during a custodial interrogation, we apply a bifurcated standard of review. *Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We review the ruling in light of the totality of the circumstances, giving total deference to the trial court on questions of historical fact, as well as its application of law to fact questions that turn on credibility and demeanor. *Pecina*, 361 S.W.3d at 79; *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). In other words, at a suppression hearing, the trial judge is the sole trier of fact and assesses the witnesses' credibility and decides the weight to give their testimony. *See Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007) But, we review de novo the trial court's rulings on questions of law and mixed questions of law and fact that do not depend on credibility determinations. *Pecina*, 361 S.W.3d at 79; *Leza*, 351 S.W.3d at 349. We view the record in the light most favorable to the trial court's ruling and reverse the judgment only if it lies outside the zone of reasonable disagreement. *Hereford v. State*, 339 S.W.3d 111, 118 (Tex. Crim. App. 2011).

If the trial court's decision is correct under any theory of law applicable to the case, the decision will be sustained. *Umana v. State*, 447 S.W.3d 346, 351 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (citing *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000).

Under Article 38.21, "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." Tex. Code Crim. Proc. Ann. art. 38.21. A defendant may claim his statement was not freely or voluntarily made and, thus, inadmissible under (1) Article 38.22, Section 6 of the Texas Code of Criminal Procedure; (2)

17

*Miranda*, as expanded in Article 38.22, Sections 2 and 3; or (3) the Due Process Clause. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008); Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2, 3, 6; U.S. Const. amend. V. A statement may be involuntary under any of these theories. *Oursbourn*, 259 S.W.3d at 169.

A confession may be involuntary under the Due Process Clause or *Miranda* only when there is police coercion or overreaching that is causally related to the confession. *Id.* "Even if a confession is not the product of a meaningful choice (for example, when it is made in response to hallucinations or to a private person's threat), it is nonetheless 'voluntary' within the meaning of the Due Process Clause absent some coercive police activity." *Oursbourn*, 259 S.W.3d at 170 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (holding that a defendant's mental condition, by itself and apart from its relation to official coercion, should not dispose of the inquiry into constitutional "voluntariness")).

During the suppression hearing, Arnold, a certified mental health peace officer, testified that his interview with appellant occurred about three hours after the offense. Arnold read the *Miranda* warnings to appellant, who claimed that he understood them. Throughout the interview, appellant's answers were appropriate for the questions asked. According to Arnold, there was no indication appellant was intoxicated or having a mental health crisis. Arnold testified appellant had been placed in a restraint chair because he was combative during the arrest, not because appellant was emotionally unstable. Arnold stopped the interview when appellant invoked his right to counsel. Arnold's interview with appellant was recorded by Arnold's body camera. The video was admitted into evidence during the suppression hearing and reviewed by the trial court.

The State also called McGuire to testify during the suppression hearing. McGuire testified that, at approximately 10:40 a.m. on the morning after the

offense, appellant reinitiated contact with investigators by telling jailers that he wanted to speak with an investigator. McGuire and DeSpain responded to appellant's request. Appellant was once again given his *Miranda* warnings and agreed to be interviewed. Once again, the interview was videoed by the police investigators and the trial court reviewed the video before ruling. Nothing about appellant's demeanor during the interview caused the two investigators to believe appellant was intoxicated or having a mental health crisis.

Appellant called Fuller during the suppression hearing. Fuller testified that he was at the Brazoria County Jail working on other cases when appellant arrived from the Pearland Police Station jail. Fuller described appellant's demeanor at the time as "psychotic," "wild-eyed," "highly agitated," and "delusional." Fuller also testified that appellant has either bipolar disorder or schizophrenia and "was not aware of the wrongfulness of his acts at the time of the offense." When asked whether he believed appellant understood the *Miranda* warnings given to him by the Pearland Police investigators, Fuller stated that he believed appellant "was very ill in and around the time of the offense." Fuller continued that "if I had been commissioned to do a competency evaluation at the time I saw him in the jail, I would have certainly found him not competent." Fuller further testified that he believed appellant was able to "literally" understand the *Miranda* warnings he received, but his judgment and perspective were impaired, which led to him speaking with the investigators. Fuller opined that appellant was psychotic at the time, and under a "delusional belief that he was a superior being and that he could carry some others along."

Nothing in the record shows that appellant's first two statements to investigators were borne by coercion or overreaching by investigators. Appellant maintains only that he was "not competent to understand the effects of waiving his

19

*Miranda* warnings." Appellant points to the fact that he had been diagnosed with schizophrenia and bipolar mood disorder and "was suffering from a mental illness at the time of the killing and during [his] interviews." Thus, appellant's argument falls under article 38.22 of the Code of Criminal Procedure— not the Due Process Clause.

Article 38.22 voluntariness claims can be broader in scope than Due Process or *Miranda*. A claim that a statement is involuntary under Article 38.22 can be predicated upon police overreaching, but can also include other factors that go to the state of mind of the defendant who has confessed, such as illness, medication, hallucinations, or private threats. *Oursbourn*, 259 S.W.3d at 172; (citing Tex. Code Crim. Proc. Ann. art. 38.22, § 6). "The voluntariness of a statement given by a person with a mental illness is reviewed under the totality of the circumstances, which is the same standard that applies to persons with regular mental capacities." *Foster v. State*, 579 S.W.3d 606, 615 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing *Delao v. State*, 235 S.W.3d 235, 241 (Tex. Crim. App. 2007)).

In this case, the evidence shows that the Pearland Police investigators advised appellant of his *Miranda* rights and his Article 38.22 statutory rights. Appellant had the basic reasoning skills to understand them and voluntarily waived them. Appellant gave no indication that his mental capabilities prevented him from understanding the warnings or the investigators' questions. *See Umana*, 447 S.W.3d at 357 ("Although [defendant] said at the close of the interview that he hears people talking to him and they tell him to do things, he did not claim, and there is no indication in the 47–minute interview, that he was having such an experience at the time of the interview.")

Based on the totality of the circumstances, the record supports the trial court's conclusion that appellant voluntarily waived his rights. *See id.* at 353–58

20

(upholding trial court's finding that waiver was voluntary, despite claim of untreated mental illness, where there was evidence defendant "knew what he was talking about," "seemed to understand what the officer was asking him," "[did] not appear as though he's in any way delusional," and "didn't appear to be hallucinating"). Accordingly, we conclude that the trial court did not abuse its discretion when it denied appellant's motion to suppress and subsequently admitted both of his statements to police investigators into evidence during appellant's trial. We overrule appellant's second issue.

## III. The trial court did not abuse its discretion when it denied appellant's request for a lesser-included offense to be included in the jury charge.

Appellant argues in his third issue that the trial court abused its discretion when it denied his request to include a lesser-included offense in the jury charge. Specifically, appellant asked the trial court to include felony injury to a child in the jury charge. Because there was less than a scintilla of evidence that would permit a rational jury to find that, if appellant was guilty, he was guilty only of the lesser-included offense of felony injury to a child, we disagree.

We apply a two-step process to determine whether a defendant was entitled to an instruction on a lesser-included offense. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). First, we determine whether the offense qualifies as a lesser-included offense under Texas Code of Criminal Procedure Article 37.09. *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011); *see* Tex. Code. Crim. Proc. art. 37.09. This is a question of law. *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). Next, we determine whether there is some evidence that would have permitted the jury to rationally find that if the defendant was guilty, he was guilty only of the lesser offense. *Id*. at 536.

Although the threshold showing for an instruction on a lesser-included

offense is low—more than a scintilla of evidence—the evidence must establish that the lesser-included offense is a valid and rational alternative to the charged offense. *Id.* "[I]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to a lesser included offense for the factfinder to consider before an instruction on a lesser included offense is warranted." *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). That evidence must also establish that the lesser-included offense is a "valid rational alternative" to the charged offense. *Cavazos*, 282 S.W.3d at 385.

We have previously determined that injury to a child is a lesser-included offense of capital murder. *Martin v. State*, 246 S.W.3d 246, 265 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Paz v. State*, 44 S.W.3d 98, 101 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). We therefore turn to whether there was some evidence in the record that would permit a rational jury to find that the defendant is guilty of only the lesser offense. *Hall*, 225 S.W.3d at 536.

In his argument appellant relies entirely on his statement to police investigators that he tossed the complainant on the floor as he followed Shekinah out of the apartment. In appellant's view, this part of his statement represents more than a scintilla of evidence that he did not intend to kill the complainant, but only to "recklessly injure" him. We conclude it is not.

In reaching this conclusion we are guided by our holding in *Paz v. State*, a similar case. *Paz,* 44 S.W.3d at 101. In *Paz*, the defendant, who was charged with capital murder, argued that the trial court should have included the lesser-included offense of injury to a child because Dr. Moore, the pathologist who conducted the autopsy of the deceased child, testified that "she did not know whether the conduct causing [the child's] death was intentional or reckless." *Id.* Unlike the present case there were no eyewitnesses to the offense in *Paz*. *Id.* at 102. As a result, we

22

had to rely on the testimony of the expert witnesses to "inform us of the nature of [the] child's injuries." *Id.* The autopsy revealed that the child "died as a result of a blunt-force head injury." *Id.* at 100. The autopsy also reported that the child had bruises to the left and right of his chin, massive hemorrhaging in the brain, and a large skull fracture. *Id.* Another expert, a Dr. Shook, examined Dr. Moore's autopsy report and when asked how much force it would take to cause the child's injuries testified that children in "high-impact motor vehicle crashes may sustain an injury this severe, but it would be unusual." *Id.* at 101. Dr. Shook continued that "even if one is propelled out of the window going 60 miles an hour, you may not get a head injury quite this severe. This is an extremely high-impact injury . . . it is not consistent with having fallen in an unintentional way." *Id.* Finally, we pointed out that Dr. Moore did not testify that she knew the blow was inflicted recklessly, only that it could have been a reckless act. *Id.* Having reviewed the evidence in the case, we affirmed the trial court's refusal to submit the lesser-included offense to the jury because there was no evidence that would warrant a charge on the lesser-included offense of injury to a child. *Id.*

In the present case, however, there was an eyewitness to the offense. Shekinah testified that she saw appellant slam the complainant's head onto the bathtub. The medical examiner testified that she observed blunt torso trauma, two rib fractures, and a large laceration of the complainant's liver. She also determined that the complainant's vertebral column was broken in two places. In addition, a portion of the complainant's brain had been knocked out of his skull and was spread out on the kitchen floor. The police investigators at the scene recovered the brain matter by wiping it up with a baby blanket and then sent it to the medical examiner. According to the medical examiner who conducted the autopsy, none of the complainant's injuries were consistent with him being dropped accidentally,

23

even on a hard surface, but instead required significant force to inflict, force like being slammed head-first into a hard object. We conclude there is no evidence in the record that would permit a rational jury to find appellant was guilty of only the lesser offense of injury to a child. *See id.* We overrule appellant's third issue.

## IV. The trial court did not abuse its discretion when it denied appellant's motion to suppress his interview with DFPS Investigator Adauto.

In his fourth issue appellant asserts that the trial court abused its discretion when it denied his motion to suppress Adauto's interview with appellant. In appellant's view: (1) Adauto was "working in tandem with the Pearland Police Department," (2) her interview with appellant was a custodial interrogation, and (3) Adauto was therefore required to give appellant *Miranda* warnings prior to the interview. *Miranda*, 384 U.S. at 479. Appellant concludes by arguing that, because it is undisputed that Adauto did not provide appellant *Miranda* warnings, the trial court should have suppressed the statement resulting from the interview.

In support of his allegation that Adauto was working in tandem with the Pearland Police, appellant argues that Adauto's testimony during the suppression hearing established that she (1) spoke with a Pearland Police detective prior to interviewing appellant at the Brazoria County Jail; (2) called the same detective after her interview with appellant and told him what she learned during the interview; (3) admitted that she did not give appellant *Miranda* warnings; and (4) was aware from her prior experience as a police detective in Del Rio, Texas, that a close relationship existed between police and DFPS. Finally, appellant argues that appellant perceived the interview with Adauto as speaking with another law enforcement official.

We address this issue under the standard of review set forth in section two above.

24

In *Wilkerson v. State*, the Court of Criminal Appeals addressed an argument similar to appellant's. 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). The Court pointed out that *Miranda* "generally applies only to questioning by law enforcement officers or their agents." *Id.* They continued that being a state employee "does not, by itself, make the person an agent of the state for the purpose of defining custodial interrogation." *Id.* (internal quotations omitted). Instead, only those state employees "who are working for or on behalf of police are law-enforcement state agents." *Id.* at 528 (internal quotations omitted). The Court recognized that while DFPS caseworkers and police both are interested in gathering information, they generally "run on separate parallel paths." *Id.* at 529. The Court also recognized, however, that "if the once-parallel paths of the [DFPS] and the police converge, and police and state agent are investigating a criminal offense in tandem, *Miranda* warnings and compliance with article 38.22 may be necessary." *Id.* When that occurs, then the DFPS worker "may be viewed as an agent of the police." *Id.* The Court stated that the "person alleging such a relationship has the burden of proving it." *Id.*

To resolve an allegation that a DFPS caseworker, such as Adauto, was working as an agent of the police, a court must examine the entire record. *Id.* at 530. Central to this analysis are the actions and perceptions of the parties involved: the police, the DFPS investigator, and the defendant. Ultimately, to be an agent for law enforcement for the purpose of custodial interrogation, Adauto had to interview appellant "for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against [appellant]." *Id.* at 531.

Having reviewed the entire record, we turn first to two allegations made by appellant which we conclude are not supported by the record. First, we find no

25

evidence on appellant's perception of Adauto during the challenged interview. Second, we conclude there is no evidence supporting appellant's allegation that Adauto, based on her prior experience as a police officer, was aware of a close working relationship between DFPS and the police. Instead, Adauto testified that when she was a detective in Del Rio, the district attorney there "would request that we - - when we're submitting cases, we do request that [any DFPS] report to be included." As a result, neither of these allegations made by appellant supports a conclusion that Adauto was working in tandem with the Pearland Police during the investigation of the complainant's death.

In addition, in making his argument that Adauto was an agent of the Pearland Police, appellant overlooks much of the evidence in the suppression hearing record which the trial court, as the trier of fact, could have reasonably believed and then relied upon in reaching its implicit conclusion that Adauto was not an agent of the Pearland Police. *See Pecina*, 361 S.W.3d at 79 (stating that reviewing courts "afford almost total deference to the trial court's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor . . . ."). This evidence includes Adauto's testimony that: (1) she worked as an investigator with the DFPS child fatality unit; (2) she was assigned to perform an investigation of the complainant's death because there was a sibling in the household; (3) her investigation was separate from the police investigation and her decision to interview appellant was not prompted by the police; (4) the purpose of her investigation was to "establish the details of the event for the safety of the surviving siblings;" (5) she met the Pearland detective at the Brazoria County Children's Assessment Center three days after the complainant was killed where she asked about the charges, the scene, and where appellant was located; (6) the Pearland detective did not tell her what to do in her investigation

and she thought it would be improper if the detective had tried to do so; (7) the main purpose behind interviewing appellant in the jail was to gather all of the facts about the complainant's death; (8) she was not trying to help the police investigation when she interviewed appellant; (9) she did not tell the detective that she was going to interview appellant; (10) while she did call the detective after her interview and provide him with an oral summary of the interview, she denied having any further contact with the Pearland Police Department and was not aware of any other member of her department contacting them; and (11) she did not provide the Pearland Police with a copy of her report.

The trial court could have also reasonably believed Pearland Police Detective McGuire's testimony during the suppression hearing. McGuire testified that he was aware that a DFPS investigation would occur simultaneously with the Pearland Police investigation. According to McGuire, he met Adauto at the Brazoria County Children's Assessment Center where they interviewed Shekinah's daughter to find out what she might have witnessed in the apartment. McGuire testified that he did not discuss anything about appellant during this meeting. McGuire denied there was a "relationship" between DFPS and the police, and instead testified that there was "a limited share process." McGuire continued that

> anytime that there's any type of an event like that and there's another - - especially with another child in the home, it's common practice that we're going to start the [DFPS] investigation. And do, since we're going to start the [DFPS] investigation, there's certain basics that have to be given like the - - a general synopsis of what took place that - - day and where the - - obviously during intake they ask specific questions like, okay, who's the alleged suspect, who's the mother, who's the father, who's - - where - - what's the address, phone numbers, ages, child's names. So, all that stuff would - - would be standard.

> McGuire denied that he gave Adauto any instructions on how to proceed

27

with her investigation. He also denied that he provided Adauto with questions to ask appellant. McGuire admitted that Adauto contacted him by telephone the evening she interviewed appellant in the Brazoria County Jail and provided him "with a brief synopsis of how" her "conversation [with appellant] had gone." McGuire testified that when he submitted his investigation report and evidence to the Brazoria County District Attorney's office, the DFPS packet was not included. McGuire explained that the police report is done in "a little bit timelier manner," and he did not believe that the DFPS report was complete at that time. Finally, McGuire testified that he had not seen or read the DFPS report on their investigation, it had not been added to his own report, but he could "probably request it."

Because there is evidence in the record, summarized above, supporting the trial court's implicit conclusion that Adauto was not acting as an agent of the Pearland Police Department when she interviewed appellant, we hold that it did not abuse its discretion when it denied appellant's motion to suppress his statement to Adauto. We overrule appellant's fourth issue.

## V. The trial court did not abuse its discretion when it decided to conduct the informal competency inquiry after the verdict but before sentence was imposed.

On the morning of the fourth day of appellant's trial, appellant's attorney filed a Motion Suggesting Incompetency and Request for Court Ordered Independent Examination by a Forensic Psychiatrist. During a hearing outside the jury's presence, appellant's attorneys asked the trial court to adjourn the trial for that forensic examination to occur. The trial court, after reading article 46B.005(d) of the Code of Criminal Procedure, denied appellant's request to adjourn the trial and instead decided to hold the informal inquiry into appellant's competency to

stand trial after the jury returned its verdict but, if appellant was found guilty, before the imposition of appellant's sentence. *See* Tex. Code Crim. Proc. Ann. art. 46B.005(d) ("If the issue of the defendant's incompetency to stand trial is raised after the trial on the merits begins, the court may determine the issue at any time before the sentence is pronounced. If the determination is delayed until after the return of a verdict, the court shall make the determination as soon as reasonably possible after the return."). Appellant argues in his fifth issue that the trial court abused its discretion when it made the decision to delay the informal inquiry into appellant's competency until after the jury returned its verdict.[3]

We review a trial court's decision regarding an informal competency inquiry for an abuse of discretion. *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009), *superseded by statute on other grounds as stated in Turner v. State*, 422 S.W.3d 676, 692 n.31 (Tex. Crim. App. 2013). Under this standard, a reviewing court does not substitute its judgment for that of the trial court. *Hobbs v. State*, 359 S.W.3d 919, 924 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Rather, a reviewing court considers whether the trial court's decision was arbitrary or unreasonable. *Id.*

Because the plain language of article 46B.005(d) of the Code of Criminal Procedure permits a trial court, once a trial on the merits has begun, to determine the issue of a defendant's competency "at any time before the sentence is pronounced," we cannot say that the trial court abused its discretion when it exercised that option. *See Beedy v. State*, 250 S.W.3d 107, 110 (Tex. Crim. App. 2008) (stating that when a trial judge lawfully exercises the option to cumulate a defendant's sentences, that decision is unassailable on appeal). We overrule

---

[3] Appellant does not challenge the trial court's decision that appellant was competent in this appeal.

appellant's fifth issue.

## VI. The trial court did not abuse its discretion when it admitted a crime-scene photograph of the deceased complainant.

In his final issue on appeal, appellant argues that the trial court abused its discretion when it admitted State's Exhibit 63, a crime scene photograph of the complainant's body laying on the kitchen floor with brain matter on the floor beside the body. While acknowledging that the photograph was relevant to the charge against him, appellant argues that the trial court should have sustained his Rule 403 objection and excluded the photograph. In appellant's view, the State had other evidence, including the police officer's bodycam videos and other photographs of the crime scene, which showed the complainant's body.

A trial court's ruling on a motion to exclude evidence under Rule 403 of the Texas Rules of Evidence is measured by an abuse of discretion standard and will not be reversed if the ruling is within the zone of reasonable disagreement. *Andrade v. State*, 246 S.W.3d 217, 227 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Relevant evidence may be excluded by the trial court under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Andrade*, 246 S.W.3d at 227. When conducting a Rule 403 balancing test, a trial court determines whether

the probative value of the evidence is substantially outweighed by several countervailing factors listed in the rule. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). The Court of Criminal Appeals explained that "unfair prejudice refers to a tendency to suggest decision on an improper basis, often an emotional one." *Id.* It further explained that "confusion of the issues" refers to a tendency to confuse or distract the jury from the main issues in the trial. *Id.* at 880. The Court then gave an example suggesting that "evidence that consumes an inordinate amount of time to present or answer . . . might tend to confuse or distract the jury from the main issues." *Id.* The Court then explained that "misleading the jury" refers to the tendency that a particular item of evidence might be "given undue weight by a jury on other than emotional grounds." *Id.* Finally, the Court stated that "undue delay" and "needless presentation of cumulative evidence" concern the efficiency of the trial proceeding rather than the threat of an inaccurate decision. *Id.* The Court then summarized these considerations by stating that a trial court, when conducting a Rule 403 analysis, "must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted." *Casey*, 215 S.W.3d at 880. "In keeping with the presumption of admissibility of relevant evidence, trial courts should favor admission in close cases." *Id.* at 879. "Generally, a photograph is admissible if verbal testimony as to matters depicted in the photograph is also admissible." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). "A trial court does not err merely because it admits into

31

evidence photographs which are gruesome." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).

We turn first to the probative force of the challenged crime scene photograph of the complainant; that is, the inherent probative force of the evidence coupled with the proponent's need for the challenged photograph. *Casey*, 215 S.W.3d at 879. We conclude that Exhibit 63 assisted the jury in understanding the medical examiner and crime scene investigator's testimony. *See Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) ("Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions."). In addition, while the State used the responding police officers' body camera videos during appellant's trial, those that showed the complainant's body at all, did so only fleetingly and from a distance. Second, Exhibit 63 was relevant to rebut appellant's defensive theory that he did not possess the intent to kill the complainant, but instead was merely reckless when he dropped the complainant. We conclude that the challenged photograph, Exhibit 63, was highly probative and the State's need for it was great. *See Drew v. State*, 76 S.W.3d 436, 452–53 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (concluding trial court did not abuse its discretion when it admitted post-autopsy photographs because they assisted the jury in understanding the medical examiner's testimony and because photographs rebutted defendant's theory that victim's death was accidental).

We turn now to balancing the probative value of the autopsy photographs against the Rule 403 counterfactors explained above. *See Casey*, 215 S.W.3d at 883.

We first examine whether the autopsy photographs have the potential to

impress the jury in an irrational but indelible way. *Andrade*, 246 S.W.3d at 228. Rule 403 does not exclude all prejudicial evidence. It focuses only on the danger of unfair prejudice. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). Unfair prejudice refers only to the tendency of relevant evidence to tempt the jury into finding guilt on grounds apart from the proof of the offense charged. *Id.* at 439. The prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or to unfairly excite emotions against the defendant. Appellant's argument is based on the latter premise.

We conclude that Exhibit 63 was not inflammatory as it was essential to establish the State's case against appellant. In addition, the photograph was addressed in a straightforward manner not designed to influence the jury in an emotional manner. Finally, the power of the photograph stems from nothing more than the effects of appellant's own criminal conduct and is no more gruesome than the facts of the offense itself. *See Sonnier*, 913 S.W.2d at 519. Even if we assume Exhibit 63 was presented to the jury in color,[4] we hold it was not of such a horrifying or appalling nature that a juror of ordinary sensitivity would have difficulty rationally deciding the critical issues of the case after viewing the exhibit. *Fuller v. State*, 829 S.W.2d 191, 206 (Tex. Crim. App. 1992), *overruled on other grounds by Castillo v. State*, 913 S.W.2d 529 (Tex. Crim. App. 1995); *Moralez v. State*, 450 S.W.3d 553, 569 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("Even if photographs are gruesome, their probative value is not substantially outweighed by the danger of unfair prejudice under Rule 403 if they are no more gruesome than the crime scene itself as it was found by the police.")

---

[4] The appellate record contains only a black and white digital version of Exhibit 63. While we can order the original if necessary, we conclude that fact is immaterial as we conclude the photograph is not overly gruesome regardless of whether the original was black and white or in color.

(internal quotations omitted).

Next, we inquire as to the tendency of Exhibit 63 to confuse or distract the jury from the main issues in the case. *See Casey*, 215 S.W.3d at 880. Here, Exhibit 63 addressed an essential element of the State's case against appellant, specifically, that his conduct that night was committed intentionally or knowingly. Exhibit 63 also served to rebut appellant's defensive theory that the complainant's fatal injuries were the result of an accident. This factor does not weigh against admitting Exhibit 63 into evidence.

Third, we examine any tendency of Exhibit 63 to be given undue weight by the jury on any basis other than emotional grounds. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). We have already concluded the challenged photograph was crucial evidence in proving the State's case against appellant. Therefore, the mere fact that it documents the result of a particularly horrific crime does not make it overly inflammatory or likely to confuse, mislead, or distract the jury. *See Santellan*, 939 S.W.2d at 168–69. This factor does not weigh against admission of Exhibit 63.

Finally, we examine the likelihood that the admission of Exhibit 63 consumed an inordinate amount of time or merely repeated evidence already admitted. *Gigliobianco*, 210 S.W.3d at 642. We conclude that the time involved in presenting Exhibit 63 to the jury and discussing its significance to the charged offense was minimal when compared to the overall length of the whole trial. We also conclude that Exhibit 63 was not cumulative of other evidence. *Chamberlain*, 998 S.W.2d at 237. This factor also does not weigh against admission of the challenged photographs.

Having considered the Rule 403 factors, we hold that the trial court did not

abuse its discretion when it overruled appellant's objection and admitted Exhibit 63. We overrule appellant's sixth issue.

## CONCLUSION

Having overruled appellant's issues on appeal, we affirm the trial court's judgment.


/s/    Jerry Zimmerer
Justice


Panel consists of Justices Wise, Zimmerer, and Poissant (Poissant, J., concurring). Publish — TEX. R. APP. P. 47.2(b).